UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

ALIMENTS KRISPY KERNELS, INC,     )
                                   )     Civil Action No:
           *Petitioner*,           )     13-cv-5995 (PGS)(DEA)
                                   )
    v.                             )
                                   )     **MEMORANDUM**
NICHOLS FARMS,                     )     **AND**
                                   )     **ORDER**
           *Respondent*.           )
                                   )
                                   )
                                   )

This matter returns to the Court after remand from the Third Circuit. *Aliments Krispy Kernels, Inc. v. Nichols Farms*, 851 F.3d 283 (3d Cir. 2017). The Third Circuit held that there were material issues of fact as to whether the parties agreed to arbitrate, which precluded the Court from entering judgment in either party's favor. Presently before the Court are cross-motions for summary judgment. (ECF Nos. 50, 61). For the reasons discussed herein, because there remain material issues of fact, both parties' motions are denied.

## BACKGROUND

This matter stems from a disagreement over whether the parties agreed to arbitrate disputes arising out of the sale of pistachios. Aliments is a Canadian company in the business of producing various nut-based snacks for consumers, and has its principle place of business in Quebec, Canada. (ECF No. 50-8, "Aliments Statement of Material Facts [SOMF]" at ¶ 1). Nichols is a California-based company that grows and sells pistachio nuts. (ECF No. 61-10, "Nichols SOMF," at ¶ 3).

According to Aliments, in August 2012, it contacted its American broker, Sterling Corporation, to purchase thousands of pounds of pistachios. (*Id.* at ¶ 4). Thereafter, on August 24, 2012, Aliments, through Sterling, contracted with Nichols to purchase 1,600 units of pistachios.

(Aliments SOMF at ¶ 2; ECF No. 21-1, "Sterling's August Sales Confirmation"). This agreement was memorialized in "Sales Confirmation" prepared by Sterling that same day. (*Id.*). The Sales Confirmation states that shipment would be made in October 2012 and includes a 30-day credit term. (ECF No. 21-1, "Sterling's August Sales Confirmation"). Additionally, this Sales Confirmation includes the following arbitration provision: "Any controversy or claim arising out of this contract shall be settled by arbitration by the Association of Food Industries of New York in accordance with its rules." (*Id.*). Nichols never signed this Confirmation. (*Id.*).

In any event, a month later, September 27, 2012, Aliments again contracted with Nichols, through Sterling, for another order of pistachios. (Aliments SOMF at ¶¶ 3-4; ECF No. 21-2, "Sterling's September Sales Confirmation"). Again, Sterling prepared a Sales Confirmation on Aliment's behalf, which included the same terms and arbitration provision as Sterling's August Sales Confirmation. (*Id.*). Moreover, as with the August Sales Confirmation, it is undisputed that Nichols never signed the September Sales Confirmation. (*Id.*). Based on the preparation of these two Sales Confirmations, Aliments contends that it had enforceable contracts with Nichols for the sale of pistachios, which would be subject to arbitration should any dispute arise. However, to Aliments' surprise, after conducting a credit check, Nichols' declined to extend credit to Aliments and, instead, offered to sell the pistachios only after receiving payment in full. (Nichols SOMF at ¶¶ 12-13). As discussed below, Aliments refused to pay in advance, and was ultimately forced to buy from another farmer.

Nichols, however, provides a different account of these transactions. According to Michael Lawrence, President of Pacific / Atlantic Crop Exchange, Inc. (Pacific), an agricultural broker, he received a call from Sterling on August 24, 2012, about purchasing pistachios from Nichols. (ECF No. 61-2, "Lawrence Declaration" at ¶ 4). Lawrence then relayed this interest to Nichols' Sales

Manager, Freddy Fernandez, who gave Lawrence a verbal confirmation as to price and quantity. (*Id.* at ¶ 5). That same day, Lawrence prepared a Sales Confirmation, memorializing the terms agreed upon, and emailed it to Sterling. (*Id.*). The following month, September 2012, Sterling contacted Pacific about making a second order for pistachios. (*Id.* at ¶ 6). Again, Lawrence relayed this information to Nichols and, after receiving verbal approval from Fernandez, prepared a second Sales Confirmation that was emailed to Sterling on September 27, 2012. (*Id.*).

Pacific's August and September Sales Confirmations contain the same terms, with regards to quantity and price, as Sterling's. However, there were apparently two different versions of Pacific's Sales Confirmations, one which included the arbitration clause and one that did not. Specifically, the August and September Sales Confirmations that Lawrence emailed to Sterling did not include an arbitration clause. (ECF No. 61-2 at 7, 9, 11, "Pacific's Emailed Confirmations"). However, the versions attached to Aliment's Motion to Confirm the Arbitration Award contain an arbitration clause, which states:

> ARBITRATION: Any controversy or claim arising out of this contract shall be settled in binding arbitration by the Association of Food Industries, Inc. of New York in accordance with its rules then obtaining.

(ECF Nos. 21-5, -6). In his declaration, Lawrence identified these versions as the transmitted copies that he sent to Sterling. (Lawrence Declaration at ¶¶ 5, 6). However, he did not explain why these versions included an arbitration clause, but the emailed Sales Confirmations did not. In any event, Lawrence did not understand the Sales Confirmations to constitute binding agreements:

> I did not discuss credit terms of the sale with [Sterling]. In the agricultural commodities business, an agreement on credit terms is one of the elements that needs to be agreed to in order for a binding contract to be created. As was the case before, I did not discuss credit terms of the sale with [Sterling] as I had no authority to do so.

3

(Lawrence Declaration at ¶ 5). He explained, "[b]ased on my many years in the commodity brokerage business, Nichols had the right to perform a credit check on [Aliments], and require security or advance payment if it thought it to be necessary." (*Id.* at ¶ 6). Lawrence also acknowledged that he received Sterling's August and September Sales Confirmations; however, because they were not signed by Aliments, he did not forward them to Nichols. (Lawrence Declaration at ¶ 8). Lawrence explained,

> [Pacific's] business practice, which I believe is consistent with industry practice, is not to forward to the seller unsigned confirmations. Instead, we wait to receive (and pass on) either a written purchase order or a signed confirmation from the buyer, which we then forward to the seller, and/or a written contract or sales acknowledgement from the seller, reflecting a firm offer to purchase product.

(*Id.*). According to Lawrence, Pacific never received a signed confirmation from Sterling. (*Id.* at ¶ 9).

Fernandez also claimed that he never received any confirmations or purchase orders that were signed by Aliments, nor was he aware that Sterling was involved with Aliments' offer. (ECF No. 61-4, "Fernandez Declaration" at ¶¶ 13-14). However, Fernandez identified the Pacific's Sales Confirmations attached to Aliments' Petition, which included the arbitration clause, as the versions he received from Lawrence. (*Id.* at ¶ 12). Like Lawrence, Fernandez also certified that it was Nichols' practice to require credit checks before agreeing to ship goods. According to Fernandez, Nichols maintained a list of approved customers, who were not subject to Nichols' credit approval requirement. (*Id.* at ¶¶ 8-9). These approved customers were generally "repeat customers or publicly traded companies (for example, Costco) with whom Nichols ha[d] experience and with whom Nichols was comfortable would pay their invoices in a timely manner. [Aliments] was not an approved customer of Nichols." (*Id.* at ¶ 9). Consistent with this practice, on September 26, 2012, Fernandez emailed Lawrence a copy of Nichols' Credit Application, saying:

> Please remember to send the credit application to [Aliments] at the same time you send us the [Purchase Order]. This will save all of us time\energy and allow us to provide good customer service. I have included our credit application again, please save it to your hard drive for future reference.

(ECF No. 61-4 at 10, "Sept. 26, 2012 Email"). As such, Aliments was expected to submit a credit application. Eventually, on November 15, 2012, Aliments submitted its application, which revealed that it was involved in a recent lawsuit with another farmer and had been delinquent on two prior purchases with Nichols. (*Id.* at ¶¶ 23-25). Based on these concerns, as well as the fact that Aliments is a Canadian company, Nichols refused to sell the pistachios to Aliments on credit. (*Id.* at ¶ 27).

At deposition, Charles Nichols, Nichols' President and CEO, testified at length that there was never an agreement between Nichols and Aliments. (ECF No. 50-3, "Nichols' Deposition"). According to Nichols, Pacific acted as an independent broker in preparing the sale of pistachios and, as such, was not authorized to enter contracts or extend credit on their behalf. (*Id.* at 17:11-21; 35:6-17). Nichols was also presented with a copy of a January 18, 2013 email that he sent to a Sterling representative. (*Id.* at 19:13-22). In this email, Nichols addressed the growing disputes between the parties and summarized what had already transpired:

1. Pacific Atlantic sent purchase orders to Nichols which conformed in price and quantity to what Nichols agreed to ship to [Aliments]. Pacific Atlantic was well versed in our credit policies and requirements for personal guarantees.
2. Nichols went through a thorough credit approval process. Based upon that review, and considering the amount of credit desired by [Aliments], credit was not extended to [Aliments]. The fact that the only two prior sales from Nichols to [Aliments] had been paid well beyond credit terms and [Aliments] is in a foreign country played a significant role in the decision not to extend credit.

(ECF No. 50-4, "January 18, 2013 email").

Nevertheless, Nichols did acknowledge that the Pacific Sales Confirmations attached to Aliment's Petition, which included the arbitration clause, as the versions purportedly sent by

Pacific to Aliments. (*Id.* at 20:1-20). However, when asked whether he disputed any of the terms included within these confirmations, Nichols responded, "I [did not] agree to anything else that was on that, other than the fact that that accurately reflected the quantity and the price." (*Id.* at 22:20-25). Nichols later explained that the Pacific Sales Confirmations were not contractual agreements, but "merely a confirmation that the price and quantity was what we had agreed to." (*Id.* at 30:8-16; 36:11-19). He also testified that, based on his experience, "30 days is a request for credit from a buyer." (*Id.* at 43:10-13). Moreover, when asked why he did not dispute the arbitration provision included within the Sales Confirmations, Nichols answered, "[i]t was never even on the radar. It was nothing that we had ever agreed to before." (*Id.* at 44:8-12). He also noted that he did not sign either document. (*Id.* at 44:13-16).

In any event, neither party disputes that Aliments refused to pay in advance. When the parties were unable to resolve this dispute, Aliments had to purchase pistachios from another producer at a higher price. (Aliments SOMF at ¶ 15). After Nichols refused to reimburse Aliments the difference in cost, Aliments initiated arbitration proceedings consistent with the arbitration clauses contained in the Sterling Sales Confirmation. (*Id.* at ¶ 17). Nichols did not participate at the arbitration hearing; and in June 2013, a three-arbitrator panel awarded Aliments $222,100 in damages. (*Id.* ¶¶ 23, 25).

Thereafter, Aliments filed a petition to confirm the arbitration award with this Court, pursuant 9 U.S.C. § 9. Nichols cross-petitioned to vacate the arbitration award. After the parties engaged in discovery, the Court granted Nichols' cross-petition, finding no genuine issue of material fact existed as to whether the parties failed to enter into "an express unequivocal agreement" to arbitrate. (ECF No. 31).

In vacating and remanding the Court's order, the Third Circuit identified three material issues of fact that precluded the Court from finding in favor of either party. *Aliments*, 851 F.3d at 293. First, a factual dispute existed "as to whether the Pacific sales confirmations that were actually emailed to Nichols and Aliments contained arbitration clauses," since some of the versions included the clause while others did not. *Id.* at 290. Second, "the record suggests that even though Nichols may have referred to the sales confirmations as 'purchase orders' or 'contract obligation[s],' that does not necessarily mean that" he viewed them as binding contractual obligations. *Id.* Finally, the Third Circuit held that a material issue of fact existed as to whether Nichols submitted a written notice of objection to the Sales Confirmations within ten days of receipt, which would render inapplicable the merchants exception to the general signature requirement. *Id.* at 291-92.

## LEGAL STANDARD

Summary judgment is appropriate under Federal Rule of Civil Procedure 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; S*iegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorp.*, 912 F.2d 654, 657 (3d Cir. 1990); *see also* Fed. R. Civ. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial").

Moreover, only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *Anderson*, 477 U.S. at 247-48. If a court determines, "after drawing all inferences in favor of [the non-moving party], and making all credibility determinations in his favor...that no reasonable jury could find for him, summary judgment is appropriate." *Alevras v. Tacopina*, 226 F. App'x 222, 227 (3d Cir. 2007).

## ANALYSIS

Presently before the Court are both parties' motions for summary judgment. Relying on the merchant's exception, Aliments contends that because Nichols was bound to arbitrate, under both the Sterling and Pacific Sale Confirmations, summary judgment is warranted and the arbitration award should be confirmed. Nichols responds, contending that the record demonstrates that it did not agree to arbitrate and that Aliments has failed to satisfy the statutory requirements of the merchant's exception; as such, it argues that summary judgment in its favor is warranted and the arbitration award should be vacated.

"When parties move to confirm or vacate an arbitration award, 'the court's function in confirming or vacating a commercial arbitration award is severely limited.'" *Daugherty v. Wash. Square Sec., Inc.*, 271 F. Supp. 2d 681, 685-86 (W.D. Pa. 2003) (quoting *Mutual Fire, Marine & Inland Ins. Co. v. Norad Reinsurance Co.*, 868 F.2d 52, 56 (3d Cir. 1989)). Where the parties have clearly agreed to arbitrate, there is a strong presumption in favor of affirming the arbitration award, which will only be set aside in very unusual circumstances. *See id.* (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 942 (1995) and *Mutual Fire*, 868 F.2d at 56); *see also* 9 U.S.C. § 10 (setting forth four bases for vacating an arbitration award). However, "that presumption applies only when interpreting the scope of an arbitration agreement, and not when deciding whether a valid agreement exists." *Flintkote Co. v. Aviva PLC*, 769 F.3d 215, 220 (3d Cir. 2014) (citing *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 527 (3d Cir. 2009)). When resolving questions of arbitrability, the Court applies the relevant state contract law, "which may be decided as a matter of law only if there is no genuine issue of material fact when viewing the facts in the light most favorable to the nonmoving party." *Aliments*, 851 F.3d at 288-89. "[W]here 'the party opposing arbitration can demonstrate, by means of citations to the record, that there is a genuine dispute as to the enforceability of the arbitration clause, the court may then proceed summarily to a trial regarding the making of the arbitration agreement or the failure, neglect, or refusal to perform the same.'" *Devon Robotics, LLC v. DeViedma*, 798 F.3d 136, 144 (3d Cir. 2015) (quoting *Guidotti v. Legal Helpers Debt Resolution, LLC*, 716 F.3d 764, 776 (3d Cir. 2013)).

Here, the Third Circuit held that this matter is governed by New Jersey law. *Id.* at 289. "Under New Jersey law, '[a]n agreement to arbitrate, like any other contract, must be the product of mutual assent, as determined under customary principles of contract law.'" *James v. Global*

*TelLink Corp.*, 852 F.3d 262, 265 (3d Cir. 2017) (quoting *Atalese v. U.S. Legal Servs. Grp., L.P.*, 99 A.3d 306, 312-13 (N.J. 2014)). "Mutual assent requires that the parties have an understanding of the terms to which they have agreed." *Atalese*, 99 A.3d at 313. Generally, when a party assents to a contract, that party is bound by *all* the terms of the contract, "even those terms that the party did not read or specifically discuss." *Aliments*, 851 F.3d at 290 (citing *Henningsen v. Bloomfield Motors, Inc.*, 161 A.2d 69, 84 (N.J. 1960)).

Where, as here, the contract is for the sale of goods, "the New Jersey Uniform Commercial Code requires that 'a contract for the sale of goods for the price of $500 or more' be set forth in writing and 'signed by the party against whom enforcement is sought or by his authorized agent or broker.'" *Id.* (quoting N.J.S.A. § 12A:2-201(1)). "But where the sales agreement is between merchants, the signature requirement is satisfied 'if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents,' and the receiving party does not give a 'written notice of objection to its contents . . . within ten days after it is received.'" *Id.* (quoting N.J.S.A. § 12A:2-201(2)).

Here, there are significant issues of material fact that prohibit the Court from finding in favor of either party. First, there remains a question as to whether the Sterling Sales Confirmations, which the arbitration panel relied upon, was an enforceable contract. It is undisputed that these Sales Confirmations were never signed by Nichols. In addition, the versions sent to Pacific were not apparently signed by Aliments.

In an attempt to reconcile this issue, Aliments focuses on the Pacific Sales Confirmations as evincing Nichols' intent to arbitrate. However, it is unclear which version of these sales confirmations would be enforceable. As noted above, there are two versions of these sales confirmations, one with and one without an arbitration clause. In any event, even assuming for a

moment that the Pacific Sales Confirmations unquestionably had an arbitration clause, there remains an issue as to whether the parties assented to be bound to the terms within. According to Nichols, he understood the terms of the thirty day credit term as a "placeholder," pending Aliment's credit application. As such, in Nichols' view, any purported agreement was conditioned on Nichols' first reviewing Aliments' credit application. However, Aliments argues just the opposite, and contends no contingent credit application was ever discussed. Additionally, Nichols made clear at his deposition that he never viewed the Sales Confirmations as contractual agreements, but only as confirmations as to the quantity and price. As such, since there remain material issues of fact in dispute, the Court is unable to find that the parties clearly agreed to arbitrate and, consequently, find in favor of either party. Therefore, both parties' cross-motions for summary judgment are denied.

## ORDER

IT IS on this 12 day of June, 2018,

**ORDERED** that Aliments' motion for summary judgment (ECF No. 50) is **DENIED**; and it is further

**ORDERED** that Nichols' motion for summary judgment (ECF No. 61) is **DENIED**; and it is further

**ORDERED** that trial is set for September 5, 2018 and, if necessary, September 6, 2018.

_____
PETER G. SHERIDAN, U.S.D.J.